R. JAY DROLETT,                :
      Plaintiff,           :     CIVIL ACTION NO.
                          :     3-05CV1335 (JCH)
     v.                   :
                          :
EDWARD J. DEMARCO, JR., et. al.,  :
      Defendants.      :     JUNE 22, 2007
                          :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 62]**

## I.    INTRODUCTION

The plaintiff, R. Jay Drolett ("Drolett"), a police officer, brings an action against defendants the Town of East Windsor ("Town"); Edward J. DeMarco, Jr., the Town's Chief of Police; Richard U. Sherman, chairman of the Town's Police Commission; and the following members of the Police Commission: Linda Sinsigallo, Mark Simmons, Lorraine DeVanney, and James Barton (collectively, "defendants"). Drolett sues each of the individually-named defendants in his or her individual capacity. Drolett alleges retaliation in violation of his First Amendment rights, pursuant to 42 U.S.C. § 1983.

The defendants have filed a Motion for Summary Judgment [Doc. No. 62] seeking to dismiss Drolett's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## II.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once

the moving party has met its burden, the nonmoving party must "set forth specific facts

showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present

such evidence as would allow a jury to find in his favor in order to defeat the motion.

Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all

inferences in favor of the party against whom summary judgement is sought.

Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a

trial is properly granted only when no rational finder of fact could find in favor of the

non-moving party." Carlton, 202 F.3d at 134. "When reasonable persons, applying the

proper legal standards, could differ in their responses to the question" raised on the

basis of the evidence presented, the question must be left to the jury. Sologub v. City

of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.    FACTUAL BACKGROUND[1]

Ronald Jay Drolett was a Sergeant in the Police Department of the Town of East

Windsor, CT. See Def.'s Loc.R.Civ.P. 56(a)1 Statement ("Def.'s Stat.") at ¶ 1 [Doc. No.

64]. When Edward J. DeMarco, Jr., became Chief of that Department in 2003, there

were twenty-four sworn police officers and twelve civilian employees. Id. at ¶¶ 2-3.

On September 16, 2004, DeMarco emailed the Police Department employees

regarding the Department's no tolerance policy on slander and rumors, and that

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the
parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is
evidence to support his allegations.

appropriate discipline would be given to those who violated that policy.  Id. at DeMarco

Aff. at Ex. A [Doc. No. 65].  DeMarco indicated that any employees with concerns were

encouraged to come to him so that he could fix them.  Id. at ¶ 8.  DeMarco further

ordered that a new Department Operational Directive ("DOD") be created to address

the subject, which was issued on September 30, 2004.  Id. at ¶¶ 9-10.  The DOD

addressed discrimination and harassment, including libelous and slanderous

statements and rumors, and defined these concepts.  Id. at DeMarco Aff. at Ex. B.  It

further informed employees that they would be disciplined for violation of the DOD.  Id.

One of Chief DeMarco's duties is to ensure that the chain of command is

followed within the Police Department.  Id. at ¶ 17.  Thus, on September 16, 2004,

DeMarco emailed employees regarding the policies on following the chain of command.

Id. at ¶ 21.  The email stated that all employees must follow the chain of command

"[w]hen discussing ANY police Department business," and must request permission

"through the chain" to "seek a higher solution," which permission "will be granted."  Id. at

DeMarco Aff. at Ex. C.  Section 5.01.01 of the Police Manual also addresses these

policies, and states that "[i]t shall be the responsibility of the position of Captain,

Lieutenant and Sergeant to see that the department's objectives are carried out in

accordance with this manual, current job description, Chain of Command and

department orders to ensure the efficient operation of the department at all times."

Id. at DeMarco Aff. at Ex. D.  Section 4.04.09 of the Police Manual further provides that

"[o]fficers shall report to their commanding officer, all matters coming to their attention

of police interest immediately."  Id. at DeMarco Aff. at Ex. E.

In 2002, Detective Matthew Carl was the Police Department's only detective. Id. at Carl Aff. at ¶ 5 [Doc. No. 68]. Several officers, but not Drolett, were assigned to assist Detective Carl in his caseload.[2] Id. at ¶ 36. On December 10, 2004, Chief DeMarco emailed employees regarding the detective assignments and ordered that the "rude comments" addressed to those assigned to the Detective Division stop immediately. Id. at DeMarco Aff. at Ex. F. According to DeMarco, Drolett was one of the employees who complained about the detective assignments. Id. at ¶ 39.

On February 14, 2005, Drolett sent an anonymous letter to four of the five members of the Police Commission, the Town of East Windsor's First Selectman, and a local newspaper, which arrived at the Police Commission on February 16, 2005, the same night that it was to conduct DeMarco's personnel evaluation. Id. at ¶¶ 44, 47. DeMarco thus learned about this letter for the first time at his review. Id. at ¶¶ 49, 51-52. The review was public knowledge, as an agenda was posted regarding the items to be addressed by the Police Commission that night. Id. at ¶ 50; Plf.'s Stat. at ¶ 50. An article about the letter was also published in the local newspaper, which was subsequently posted in the Police Department's patrol room. See Def.'s Stat. at ¶ 48.

The anonymous letter informed the Commission of five "things that are going on" of which it may not have been aware:

---

[2]According to the defendants, Drolett was not assigned to assist Detective Carl because Chief DeMarco suspected that Drolett had compromised an earlier undercover sting investigation and also believed Drolett had poor investigation skills. See id. at ¶ 36. Drolett claims that this suspicion was based on an unsubstantiated rumor. See Plf.'s Loc.R.Civ.P. 56(a)2 Statement ("Plf.'s Stat.") at Drolett Aff. at ¶ 38 [Doc. No. 74].

(#1)    Many shifts are without supervisors or even experienced officers because some people are not required to work their scheduled shifts.  They are even handed the opportunity to get off them.

(#2)    Some people are sent all over the country for training while others get only the minimum.  And other important training is also put off.

(#3)    So much money was spent on the cars for the chief and detective that their [sic] wasn't enough left for the line cars.  Maybe the money spent on remote starters, tinted windows and multi deck CD players for 2 people could of [sic] helped the many that do the work.  How much over what was budgeted for those cars was spent?

(#4)    Manpower from the whole department was diverted to cover for one person who didn't do his job till the complaints were too much to hide.  We are talking about a guy who did as few as 1 arrest warrant per year and would have been fired any where else.

(#5)    The standard golden circle where some people can getaway with anything and have all the assignments handed to them and are praised for the simplest things and others are used as scape goats and only their [sic] to be used.  This area include the double standards that really hurt moral [sic].

See id. at ¶ 45; Complaint at Ex. A [Doc. No. 1].  Paragraph Two referred to Carl and DeMarco, referencing the former's investigation training in Florida and the latter's FBI training in Virginia.  Id. at ¶¶ 82-83.  Paragraph Four referred to Carl.  Id. at ¶ 57.

According to Richard U. Sherman, Chairman of the Town of East Windsor Police Commission, the Commission believed the letter was written by a "disgruntled police officer who wished to primarily complain about personal gripes or grievances," and who wished to embarrass DeMarco on the night of his review.  Id. at Sherman Aff. at ¶¶  1, 23-24 [Doc. No. 66].  Much of the information in the letter was already known to the Commission.  Id. at Sherman Aff. at ¶ 25.  All of the information contained in the letter is disputed by the defendants as "mis-truths and misinformation."  Id. at ¶ 129.  Drolett used the term "golden circle" to refer to alleged favoritism some Department employees received from DeMarco and his Administration.  See Plf.'s Stat. at ¶ 33.  After writing the letter, Officer David McNeice, Jr. complained about Drolett considering him to be a

"golden boy" in an email to his superior officer, which was forwarded to DeMarco. See Def.'s Stat. at ¶ 127.

Sergeant Michael Hannaford, the Department's Internal Affairs Investigator, conducted an internal investigation regarding the anonymous letter. Id. at ¶¶ 137-38. At least two police officers were questioned during this investigation before Drolett admitted that he had written and sent the letter as an East Windsor resident. Id. at ¶¶ 139-41. Hannaford concluded that the contents of Drolett's letter were derived from his position as police officer and supervisor, that Drolett "consciously chose to ignore this department's chain of command," and that Drolett's letter "was intended to disrupt the order of this department, to cause personal discredit to the reputations of the Chief of Police and Detective." Id. at Hannaford Aff. at Ex. A [Doc. No. 67]. Hannaford also found Drolett had violated some provisions of the Police Manual and DODs. Id.

The question of whether any discipline was warranted was referred to the Police Commission, which held a public hearing on June 8, 2005. Id. at ¶¶ 148-49. Drolett was represented by a union-appointed lawyer. Id. at ¶ 151. At the conclusion of the hearing, the Commission found Drolett to have violated some provisions of the Police Manual and DODs, and suspended him for ten days without pay and placed him on probation for six months. Id. at DeMarco Aff. at Ex. K. Drolett grieved this discipline, and three days of hearing were held before the Connecticut Department of Labor Board of Mediation and Arbitration at the end of 2006.[3] Id. at ¶ 157-58.

_____

[3]The Board was to issue a decision in May 2007. Id. at ¶ 158.

## IV.     DISCUSSION

### A.     First Amendment Retaliation

Drolett claims that the discipline he received was done in retaliation for exercising his First Amendment right to protest workplace mismanagement and other matters by sending an anonymous letter to the Police Commission.  The defendants challenge Drolett's retaliation claim on a number of grounds.

It is well-accepted that "public employees do not surrender all their First Amendment rights by reason of their employment."  Garcetti v. Ceballos, __ U.S. __, 126 S. Ct. 1951, 1957 (2006).  However, "[i]n measuring the extent of this right, the interests that must be carefully balanced are the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir. 2003) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).  "In order to establish a First Amendment claim of retaliation as a public employee, [a plaintiff] must show that (1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action."  Konits v. Valley Stream Cent. High School Dist., 394 F.3d 121, 124 (2d Cir. 2005) (internal quotation marks omitted).

The first question the court must ask in deciding a First Amendment retaliation claim is whether the public employee spoke "as a citizen upon matters of public concern" or "as an employee upon matters of personal interest."  Connick v. Myers, 461 U.S. 138, 147 (1983); see also Melzer v. Bd. of Ed., 336 F.3d 185, 193 (2d Cir. 2003).

If the court finds that the employee spoke as an employee on a matter of personal interest, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Garcetti, 126 S. Ct. at 1958.

In Garcetti, the Supreme Court focused on when a public employee speaks "as a citizen" under the First Amendment. See Garcetti, 126 S. Ct. at 1956 (finding that the Ninth Circuit erred in ignoring whether the plaintiff made the speech at issue "as a citizen" and only determining that the speech addressed a matter of public concern). The Court attempted to balance "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion," with the need to avoid empowering public employees to "constitutionalize the employee grievance." Id. at 1958, 1959. Looking at the facts in Garcetti, the Court reasoned that, while relevant, the fact that the speech at issue was made inside the office, rather than publicly, and that the speech concerned the subject matter of the speaker's employment, were not dispositive. Id. at 1959. The Court ultimately found that the "controlling factor" in the case was that the speaker's "expressions were made pursuant to his duties." Id. at 1959-60. Thus, the Court held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 1960.

The defendants argue that Drolett is not entitled to First Amendment protection because "he had a duty as part of his employment to say what he said (following the chain of command to do so)." See Def.'s Memorandum in Support of Motion for Summary Judgment ("Mem. in Supp.") at 2 [Doc. No. 63]. They point to Section

8

4.04.09 of the Police Manual, which requires "[o]fficers [to] report to their commanding officer, all matters coming to their attention of police interest immediately," see Def.'s Stat. at DeMarco Aff. at Ex. E, and argue that the statements in Drolett's letter are "matters of police interest," see Def.'s Mem. in Supp. at 27.  Thus, according to the defendants, Drolett was discharging his police officer's duty to report by reporting these matters, even though in violation of the established chain of command.  Id.  Drolett argues that the aforementioned provision of the Police Manual applies only to Police Department employees "who are acting in the course of performing their police duties," and thus is inapplicable in his situation, where he was communicating to the Police Commission as a "taxpayer, resident and citizen."  See Plf.'s Stat. at Drolett Aff. at ¶ 37.

The court concludes that, on the record before this court, there are genuine issues of material fact as to whether Drolett was acting pursuant to his official duties when he sent his letter to the Police Commission and local press.  The defendants' argument appears to center on Police Department rules and regulations that give employees a duty to report problems and that they must do so through the chain of command.  This argument is similar to one rejected by the court in Barclay v. Michalsky, 451 F. Supp. 2d 386, 395-96 (D. Conn. 2006), in which a nurse complained to her supervisors about employees sleeping on the job and the use of excessive restraints. With respect to the Garcetti argument, the court held that, "[n]otwithstanding that Work Rule #30 requires employees to report any rule violations to their supervisors, as Garcetti instructed the inquiry is a practical one, and material issues of fact exist as to whether plaintiff's complaints were made in the context of her job responsibilities." Id. at 395.

Here, there is no evidence that Drolett's official duties included complaining about all kinds of workplace mismanagement, whatever the context in which these complaints were made.[4]  In Garcetti, there was no dispute that part of the plaintiff's responsibilities as calendar deputy were to investigate concerns and advise his supervisors regarding pending criminal cases.  See Garcetti, 126 S. Ct. at 1960.  Under these circumstances, the Supreme Court found that the plaintiff was doing what he was employed to do, and was therefore acting not as a citizen but as a government employee whose speech did not qualify for First Amendment protection.  Id.  Here, unlike Garcetti, the parties dispute whether complaining (anonymously) to the Police Commission about staffing, mismanagement, and budgetary issues was part of Drolett's ordinary job duties or "core function" as Sergeant.  See Kodrea v. City of Kokomo, Ind., 458 F. Supp. 2d 857, 868 (S.D. Ind. 2006) (cited in Barclay, 451 F. Supp. 2d at 396 n.6).  The court does not construe the Police Department's rules to require Drolett to make complaints, but only to permit him to do so – that is, there is no evidence that he was employed specifically to make such reports.[5]  See Garcetti, 126 S. Ct. at 1959-60 ("The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy. . . . Ceballos wrote his disposition

---

[4]The court finds that Drolett's argument, that Garcetti does not apply because nothing in his job description required him to send letters to the Police Commission, is inapposite. Instead, the proper focus is to determine whether Drolett had a duty to report on all kinds of issues pursuant to his official job duties.  See Garcetti, 126 S. Ct. at 1960.

[5]The defendants concentrate on the fact that Drolett had an official duty to follow the chain of command.  However, the court finds that the contours of Garcetti, which the Supreme Court has not yet defined, see 126 S. Ct. at 1961, would be stretched too far by accepting the argument that the mere existence of such a duty means that any discipline for violating it is insulated from First Amendment protection.

memo because that is part of what he, as a calendar deputy, was employed to do."). Indeed, the defendants have not established that reporting such matters "was <u>particularly</u> within the province of plaintiff's professional duties, more so than that of other [Police Department] employees." <u>See Barclay</u>, 451 F. Supp. 2d at 396 (emphasis added).

Furthermore, while it is true that the Police Manual required employees to report all matters "of police interest," the court finds that this cannot be construed to mean that police officers have an official duty to report <u>all</u> matters involving the Police Department, regardless of context. Such a construction would ignore the Supreme Court's admonition that "[t]he First Amendment protects some expressions related to the speaker's job," and thus whether the subject matter of the speech involved the speaker's employment is "nondispositive." <u>Garcetti</u>, 126 S. Ct. at 1959. Indeed, as another court in this Circuit put it, the defendants' broad construction would

> have this Court transform <u>Garcetti</u> into an impermeable rule that all speech by governmental officials, no matter the facts presented, is fully engulfed by their governmental duties and eschewing, under any circumstance, the possibility or the opportunity that on another given day they may speak as private citizens on matters that may be relatively close to their employment. If we were to adopt Defendants' argument, we would inextricably have [to] find that <u>Garcetti</u> dictates a bright-line rule–an all or nothing determination–on an employee's speech even if it tangentially concerns the official's employment. We find that <u>Garcetti</u> does not stand for that proposition.

<u>Jackson v. Jimino</u>, 2007 WL 1160409, at *3 (N.D.N.Y. 2007). Because the record does not clearly establish that Drolett wrote his letter to the Police Commission as part of the discharge of his duties as a police officer, the court concludes that <u>Garcetti</u> does not control the outcome of this motion. Thus, the court must turn to whether Drolett's speech addressed a matter of public concern.

Whether an employee's speech addresses a matter of public concern is a question of law that "must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 146; see also Rankin v. McPherson, 483 U.S. 378, 388 (1987); Reuland v. Hynes, 460 F.3d 409, 416 (2d Cir. 2006). "As a general rule, speech on 'any matter of political, social, or other concern to the community' is protected by the First Amendment." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999) (quoting Connick, 461 U.S. at 146).

Thus, while looking to the record as a whole, a court must analyze the content, form, and context of an employee's speech in order to decide whether it addresses an issue of public concern. Connick, 461 U.S. at 147-48. Drolett argues that his letter addressing staffing and training issues, expenditure of funds, and mismanagement or favoritism are matters of public concern. See Plf.'s Mem. in Opp. at 4-6. To support his argument, Drolett cites Morris, 196 F.3d at 111, in which the Second Circuit found that "speech on crime rates, police staffing, equipment shortages and related budgetary matters quite plainly involve matters of public concern." The defendants respond by arguing that all of the statements in Drolett's letter involved personal grievances dealing only with an employee's personal working conditions, and thus they do not constitute matters of public concern. See Def.'s Mem in Supp. at 33-36.

While a speaker's motive is not dispositive to whether his speech concerned a matter of public concern, Reuland, 460 F.3d at 418, the court must still take "content, form, and context" into consideration in making this determination, Connick, 461 U.S. at 147-48, and it may therefore also consider "whether the speech 'was calculated to redress personal grievances or whether it had a broader public purpose,'" Hoyt v.

12

Andreucci, 433 F.3d 320, 330 (2d Cir. 2006) (citations omitted).  The court finds it significant that Drolett's letter was written anonymously, was sent to the Police Commission where it became public knowledge, and was also sent to the Town's First Selectman and local newspaper.  These facts go far toward at least creating an issue of fact as to whether Drolett was complaining as a citizen and taxpayer on matters of concern to the public as a whole, and not just to him as a government employee.[6] Drolett has consistently indicated that he was communicating to the Police Commission as a "taxpayer, resident and citizen."  See Plf.'s Stat. at Drolett Aff. at ¶ 37.

In addition, evaluating each of Drolett's statements separately, the court finds that they all relate to matters of public concern.  As Drolett points out, the Second Circuit held that speech on police staffing and budgetary matters "quite plainly involve matters of public concern."  Morris, 196 F.3d at 111; see also Lewis v. Cowen, 165 F.3d 154, 164 (2d Cir. 1999) ("Courts have frequently found that the public fisc is a matter of public concern.").  These issues are addressed, directly or indirectly, in Paragraphs One, Three, and Four of Drolett's letter to the Police Commission.  The court also finds Paragraph Two, alleging inadequate or unequal training, to be a matter of public concern, because the public has an interest in the training of its police officers.[7]  Cf.

---

[6]The court finds that the defendants' argument that "context, form and motive compel the conclusion that Drolett's public concern assertion is a transparent attempt to immunize him from discipline for airing his personal gripes in public in violation of his duties as a police officer," see Def.'s Reply at 9 [Doc. No. 80], raises an issue of fact as to Drolett's motive – that is, whether he wrote the letter to the Police Commission as a citizen and taxpayer on matters of public concern or as an employee on personal matters.  The court cannot, as a matter of law, reach the conclusion defendants urge, based on Drolett's testimony regarding this issue.

[7]The fact that Paragraph Two referred to Detective Carl and Chief DeMarco, and Paragraph Four referred to Detective Carl, persons toward whom Drolett, according to the defendants, harbored animosity, see Def.'s Mem. in Supp. at 34, does not make the

Barclay, 451 F. Supp. 2d at 396-97. Similarly, the public has a concern in the policies and practices of a local police department, including allegations of favoritism and other practices damaging morale. See Shelton Police Union, Inc. v. Voccola, 125 F. Supp. 2d 604, 627-28 (D. Conn. 2001) (finding statements concerning racial comments by the Chief of Police, conflicts of interest within the police department, and the general operation and management of the police department involved matters of public concern); cf. Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003). Thus, Paragraph Five also relates to a matter of public concern. Hence, "[b]ecause [Drolett's] statements were not personal, involved departmental practices and policies, were made in the context of community discourse about the issues, and were made to the public, they were matters of public concern." Voccola, 125 F. Supp. 2d at 628.

Because at least some of Drolett's statements arguably concerned a public issue, the court turns to the defendants' next argument, that even if Drolett's speech relates to a matter of public concern, the Pickering balance falls in the employer's favor.[8] See Def.'s Mem. in Supp. at 2. Indeed, "[a] government official may nonetheless fire an employee for speaking on a matter of public concern if the employee's speech is reasonably likely to disrupt the effective functioning of the office, and the employee is fired to prevent this disruption." Sheppard, 317 F.3d at 355. To make this determination, courts must balance the potential for disruptiveness in the

statements' substance (training and staffing) any less matters of public concern.

[8]The Pickering balancing is triggered even if only some of the speech touches on a matter of public concern. See Connick, 461 U.S. at 148-50 (proceeding to the Pickering balancing even though only one of plaintiff's questions was on a matter of public concern).

workplace against a public employee's First Amendment rights.  See, e.g., Connick, 461 U.S. at 150-53; Lewis, 165 F.3d at 161 ("This weighing, commonly referred to as the Pickering balancing test, is necessitated by the State's dual role as employer and sovereign.").  This balancing test requires courts to weigh the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[9]  Sheppard, 317 F.3d at 355 (quoting Pickering, 391 U.S. at 568).  However, "[e]ven if the court finds that the competing interests favor the government/employer, a First Amendment plaintiff can establish liability 'by proving that the employer disciplined the employee in retaliation for the speech, rather than out of fear of the disruption.'"  Sweeney v. Leone, 2006 WL 2246372, at *6 (D. Conn. 2006) (quoting Lewis, 165 F.3d at 163).

The defendants make a variety of arguments to support their Pickering analysis. They note first that police departments, as para-military organizations, are given greater latitude in regulating employees' speech than other governmental bodies.  See Def.'s Mem. in Supp. at 21.  They also argue that Drolett's letter actually disrupted the effective functioning of the Police Department, or that it was reasonably likely to do so, and that the court should defer to the employer's judgment of disruption.  Id. at 22-24.

---

[9]The Second Circuit has stated that, "[w]hile as a general rule the [Pickering] test is a matter of law for the district court to apply, where there are questions of fact relevant to that application, this court has made known that 'we can envision cases in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury prior [to] the [district] court's application of the Pickering balancing test.'" Johnson, 342 F.3d at 114 (2d Cir.2003) (citations omitted).

Finally, they argue that Drolett's failure to follow the chain of command results in the Pickering balancing falling in the defendants' favor. Id. at 24-26. Drolett disputes that any disruption occurred, or was likely to occur, as a result of his anonymous letter to the Police Commission. See Plf.'s Mem. in Opp. at 10-16.

With respect to the disruption argument, the defendants assert that Drolett's letter "caused turmoil and disturbance" within the Police Department, and negatively affected relations among employees by creating tensions and distrust. See Def.'s Stat. at Polinquin Aff. at ¶ 6 [Doc. No. 69]; McNeice Aff. at ¶¶ 8, 20 [Doc. No. 70]. However, Drolett has presented testimony, both his own and that of Officer John A. Scavotto, that his letter "did not cause disruption to the department as a whole," see Plf.'s Stat. at Scavotto Aff. at ¶ 13 [Doc. No. 75]; Drolett Aff. at ¶ 45, and thus has created an issue of fact as to whether the letter became a general source of discussion or affected officer morale or relations, or whether it was likely to cause such disruption. See Plf.'s Stat. at Scavotto Aff. at ¶¶ 13-15. Indeed, according to Drolett's evidence, tensions and lack of morale were already present well before he sent his letter, due to favoritism and supervisory problems within the Department. Id. at ¶¶ 4, 14.

However, even if the court accepts the defendants' disruption argument for purposes of this Motion, the Pickering inquiry does not end there. Indeed, in such a case, "a First Amendment plaintiff can [still] establish liability 'by proving that the employer disciplined the employee in retaliation for the speech, rather than out of fear of the disruption.'" Sweeney, 2006 WL 2246372, at *6 (citations omitted). The court finds that there is a genuine issue of fact such that reasonable minds could differ as to whether Drolett's speech, rather than its potential for disruption, motivated the

defendants' discipline of him. Although the defendants argue that Drolett was disciplined for violating Police Department rules, including sidestepping the chain of command and the requirement that all police matters be reported within the Department, the court has already found that these rules do not necessarily apply in a situation, such as this one, where Drolett sent his letter anonymously, and, according to Drolett, as a citizen and taxpayer rather than as a government employee. See supra at 11.

Moreover, at the June 8, 2005 hearing in front of the Police Commission, Chief DeMarco indicated that the nature of the charges against Drolett included, among others, "the false statements about other employees;" DeMarco also accused Drolett of giving "mis-truths and misinformation" and making one allegation that is "extremely offensive to one of the employees who works in this building and we have to remember that there is a victim here." See Def.'s Stat. at DeMarco Aff. at 8, 23. This evidence creates an issue of fact as to whether Drolett's speech, rather than any disruption it may have caused, was the reason for the disciplinary action taken by the Commission. The court cannot, therefore, find for the defendants as a matter of law on whether Drolett's suspension was based on the potential for disruption rather than because of his speech, because this question involves the defendants' motives, which involves unresolved questions of fact. See Johnson, 342 F.3d at 114-15 (finding factual issue existed over employer's motives for firing employee because employee would not have been fired if he had not written the letters that led to disruption).

Finally, the defendants argue that Drolett was disciplined for making several false or hyperbolic statements in his letter to the Police Commission.[10]  See Def.'s Mem. in Supp. at 27.  The Pickering Court applied the standard set out in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), and found that the plaintiff could not be discharged for his public statement, even though it was at least partially false, without proof that the statement was knowingly or recklessly made.  Pickering, 391 U.S. at 574.  Similarly, the Second Circuit held in Reuland v. Hynes, 460 F.3d at 413-15, that "[f]alse speech, as well as hyperbole, is still entitled to First Amendment protection, as long as it is not made with knowledge or reckless disregard of its falsity."  The reason for such protection is because "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive.'"  Sullivan, 376 U.S. at 271-72 (citations omitted).  This protection for false speech also applies to public employee speech.  Reuland, 460 F.3d at 414.

To show that Drolett's statements are not entitled to First Amendment protection because they are false or hyperbolic, the defendants must show that each of the statements "(1) would reasonably have been perceived as an assertion of fact, (2) was false, and (3) was made with knowledge or reckless disregard of its falsity."  Id.

Regarding Paragraph One, Drolett admitted that the Department met the Town policy of shift minimums and acknowledged that budgetary constraints made it difficult to staff every shift with a sergeant.  See Def.s Stat. at Ex. A, Hearing of Connecticut

---

[10]The defendants claim that four of the five statements in Drolett's letter were false.  The fifth statement, regarding the "golden circle," is a statement of opinion; however, the defendants claim that "this opinion that favoritism exists is expressed in such a hyperbolic fashion" that it, too, is not protected by the First Amendment.  See Def.'s Mem. in Supp. at 27 n.19.

Department of Labor Board of Mediation and Arbitration ("DOL Hearing") at 91-92 [Doc. No. 64]. However, Drolett also provided evidence that some shifts were without "even experienced officers," see Plf.'s Stat. at Drolett Aff. at ¶ 22, and the parties have not pointed to evidence in the record indicating that the minimum shift requirement did not include having an experienced officer on a shift. As for whether some officers were "handed the opportunity to get off [shifts]," police officers are at times given special work assignments, such as fleet or computer maintenance or training officer work. See Def.'s Stat. at ¶¶ 99-100. Drolett was given some of these special assignments from time to time. Id. at 101. Drolett testified that one sergeant did not work the midnight shift on numerous nights in July and August 2003 "because he had accumulated compensatory time working on computers as a special assignment." See Plf.'s Stat. at Drolett Aff. at ¶ 22. Although the defendants point to Chief DeMarco's contractual requirement to accommodate an officer's compensatory time, which could affect shift coverage, see Def.'s Stat. at 102, the court cannot conclude on the record before it that Drolett made the criticism knowing it was false or recklessly disregarding the truth.

Paragraph Two of the letter referred to Detective Carl and Chief DeMarco, referencing the former's investigation training in Florida and the latter's FBI training in Virginia. Id. at ¶¶ 82-83. Other officers have also attended out-of-state training opportunities. Id. at ¶ 84. Drolett requested bicycle training in Brunswick, GA, which was rejected.[11] Id. at ¶ 87. Several months prior to this request, Drolett had broken his

---

[11]Although the defendants list a number of training programs to which Drolett applied for, but was rejected, see id. at ¶¶ 85-86, the relevant pages of Drolett's testimony, Ex. A, DOL 66-68, discussing these programs are missing from the defendants' exhibits; thus, the court is unable to take them into consideration.

clavicle riding his bicycle recreationally.  Id. at ¶ 88.  On January 31, 2005, DeMarco emailed Drolett that the child protection computerized training he had requested would not be granted, because he could not lose a supervisor for 16 hours a week.  Id. at DeMarco Aff. at Ex. H.  Based on these facts, it appears Drolett made the statement based on his experience, and thus there is an issue of fact as to whether he made the statement about training knowing it was false or recklessly not knowing it was false.

Paragraph Three also appears to have been made based on the information available to Drolett at the time.  DeMarco's administrative assistant informed Drolett there was not enough money to pay for stop sticks and defibrillators due to the money spent on the cars for the Chief and the Detective.  Id. at ¶ 114.  While the defendants claim that the administrative assistant was mistaken, id. at DeMarco Aff. at ¶ 76, and there was sufficient money to purchase these line car items but there was a delay in purchasing them, it is not clear if such purchases were made before or after Drolett's letter.  Thus, based on the evidence before it, the court cannot now conclude Drolett made any false statements or recklessly disregarded the truth in this Paragraph.

Paragraph Four of the letter referred to Detective Carl, the Police Department's only detective.  See Def.'s Stat. at Carl Aff. at ¶ 5.  At various times, some officers were assigned to assist Carl in his caseload.  Drolett testified that other officers told him that there was "a drawer full of files that Detective Carl had not gotten to," although he acknowledged that this statement was based on hearsay.  See Def.'s Stat. at ¶ 76.  However, this statement need not be taken for the truth of what it asserts, but to indicate Drolett's state of mind prior to writing his letter.  If so, this information, in addition to Drolett's disagreement with the defendants that there was "more work than

20

one detective could handle," see Def.'s Stat. at Ex. A, DOL Hearing at 62, creates an issue of fact as to whether Drolett made this statement with knowledge that it was false or a reckless disregard for the truth.

As for the second statement in Paragraph Four regarding Carl's arrest warrant statistics, this was based upon Drolett's viewing of a handwritten log kept by the Records Clerk. Id. at ¶ 62. All warrant information is located in the electronic information system of the Department's internal computer system. Id. at ¶ 65. Drolett was familiar with this system and had access to all the (unsealed) information stored within it. Id. at ¶¶ 67-68. However, Drolett claims that, as he understood the record-keeping system as of February 2005, he believed the handwritten log contained the same information as the electronic records. See Plf.'s Stat. at Drolett Aff. at ¶ 18; Def.'s Stat. at Ex. A, DOL Hearing at 49. Drolett also claims that, when he told DeMarco that he had reviewed the arrest warrant log with respect to Carl, DeMarco did not question him as to the accuracy of those records. See Plf.'s Stat. at Drolett Aff. at ¶ 18. Drolett appears to have made the statement based on the information available to him, believing it was true at the time it was made, which does not as a matter of law show that Drolett made the allegation knowing it was false or recklessly disregarding the truth.

Finally, the defendants' argument with respect to Paragraph Five is that "[i]t is virtually impossible to respond to such a vague and conclusory allegation" of favoritism. See Def.'s Mem. in Supp. at 27 n.19. The court already found that Drolett has provided evidence of favoritism, see supra at 16 (citing Plf.'s Stat. at Scavotto Aff. at ¶¶ 4, 14), and thus it cannot conclude as a matter of law that Drolett made this statement with falsity or reckless disregard for the truth.

For the foregoing reasons, the Motion for Summary Judgment is denied.

**B.    Qualified Immunity**

The court next addresses the defendants' claim that qualified immunity shields DeMarco and the Police Commissioners from individual liability for the federal violation alleged in this suit.  Qualified immunity insulates government officials from personal liability when they perform discretionary duties pursuant to their official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The threshold question in determining whether a government actor's actions warrant qualified immunity is "whether the plaintiff's version of the facts show[s] the officer's conduct violated a constitutional right."  Demoret v. Zegarelli, 451 F.3d 140, 148 (2d Cir.2006) (citations omitted).  If "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  Id.  If so, government officials are entitled to qualified immunity "only if [they] can show that, viewing the evidence in the light most favorable to plaintiff[], no reasonable jury could conclude that the defendant[s] acted unreasonably in light of the clearly established law."  Id. (citations omitted).

The court has already found that Drolett created a material issue of fact on his First Amendment claim.  Moreover, "[t]he prohibition against suspending or terminating employees for the content of their speech has been clearly established since 1968."[12]

_____

[12]Although Garcetti has rendered certain aspects of First Amendment retaliation law unclear, the court found that Garcetti was not controlling to the facts of this case.  See supra at 11.  In addition, the defendants' argument that the use of a balancing test in determining the presence of a right means that the right is not clearly established is based on case law from

Johnson, 342 F.3d at 116. Therefore, the defendants are only entitled to qualified immunity if it was "'objectively reasonable for [them] to believe that [their] conduct did not violate [Drolett's] rights.'" Savino v. City of New York, 331 F.3d 63, 71 (2d Cir.2003) (citations omitted).

The court finds that a reasonable jury could conclude that the defendants acted unreasonably in light of this clearly established law. To the extent the defendants' qualified immunity defense is based on the assertion that Drolett's letter to the Police Commission was not a matter of public concern because it was false or hyperbolic, the Second Circuit recently indicated that the existence of well-established Supreme Court precedent regarding hyperbolic speech under the First Amendment renders it unreasonable for the defendants to believe Drolett's speech was not protected "because it was untrue." Reuland, 460 F.3d at 420. Moreover, the context in which his letter was sent – anonymously and to the Commission as well as a local politician and newspaper – and the content of the statements themselves, indicate that the letter was not written in Drolett's capacity as a police officer. Thus, it would not have been objectively reasonable for the defendants to believe that Drolett's letter was not a matter of public concern, or that they could discipline him because of having sent it.

The defendants rely on a case from outside of the Circuit, Wagner v. City of Holyoke, 404 F.3d 504 (1st Cir. 2005), in support of their argument that Drolett's broad

_____

other circuits, and is therefore not controlling to this court. See Def.'s Mem. in Supp. at 38. In fact, in a recent post-Garcetti decision, the Second Circuit reiterated that "previous cases have recognized and defined the First Amendment right of public employees to be free from retaliation for speech on matters of public concern with reasonable clarity." Reuland, 460 F.3d at 419-20.

and antagonistic complaints and his disregard of the chain of command made it reasonable for the defendants to have believed they were entitled to discipline him regardless of the content of his speech.  See Def.'s Mem. in Supp. at 39-40.  However, this case is not controlling on this court, which is bound by such decisions as Reuland, a First Amendment retaliation case in which the Second Circuit stated that where "'specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law.'"  460 F.3d at 419; see also Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003) ("Where specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate.").  Despite the defendants' assertion that they disciplined Drolett for the disruption he caused and the rules he violated, reading the evidence in the light most favorable to Drolett, there is evidence in the record that could support an inference that the defendants disciplined him as a result of his protected speech.  See Barclay, 451 F. Supp. 2d at 400.

## V.     CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment [**Doc. No. 62**] is DENIED.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 22nd day of June, 2007.


                              /s/ Janet C. Hall
                             Janet C. Hall
                             United States District Judge